## TENNESSEE GAS PIPELINE COMPANY

v.

## 104 ACRES OF LAND MORE OR LESS, IN PROVIDENCE COUNTY OF the STATE OF RHODE ISLAND, Perry L. Olson, et al., and Western Industrial Complex, Inc., Southern New England Production Credit Association, William M. Stamp, Ruth B. Stamp, William M. Stamp, Jr., Carol J. Stamp and Martha A. Stamp.

Civ. A. No. 89–0758B.

United States District Court, D. Rhode Island.

Dec. 2, 1991.

Paul M. Sanford, Tillinghast, Collins & Graham, Providence, R.I., for plaintiff.

Anthony F. Muri, Goldenberg & Muri, Providence, R.I., for defendants.

## OPINION

FRANCIS J. BOYLE, Chief Judge.

This is an action for damages arising from the condemnation of a pipeline easement across an 80.8 acre, industrially-zoned tract of land located in Cranston, Rhode Island. In November, 1990, this court, pursuant to 15 U.S.C. § 717f(h), granted plaintiff, Tennessee Gas Pipeline Company (Tennessee Gas), a 1.759 acre perpetual easement and a 1.524 acre temporary workspace easement across land owned by defendant Western Industrial Complex, Inc. (Western Industrial).

Defendant's property, referred to as "Western Industrial Complex–Section 2" (Section 2), is already encumbered with a utility easement granted to Narragansett Electric Company. The Narragansett easement runs north and south through the center of the property dividing Section 2 into two tracts known as "Phase I" and "Phase II." Phase I lies to the east of the Narragansett easement, and Phase II lies to the west of the Narragansett easement. Plaintiff's temporary and permanent easements are located within Phase II along the western border of the Narragansett easement. Plaintiff's temporary easement lies completely inside the Narragansett easement, while fifteen feet of the permanent easement is parallel to and outside the western boundary of the Narragansett easement. Improvements on Section 2 consist of underground water and sewer lines in both Phase I and Phase II and rough road cuts in Phase I.

On March 23, 1983, the Cranston Planning Commission (Commission) preliminarily approved a proposed industrial subdivision for Section 2, Phase II. This preliminarily approved subdivision map, however, does not contain the same configuration of lots as the proposed subdivision map on which Western Industrial's expert relied to calculate damages in the present condemnation proceeding.

Subject to certain conditions, the Commission granted final approval to subdivision plans for Section 2, Phase I in 1986. These conditions included obtaining wetlands approval, posting a bond, and recording deed restrictions. At the present date, most of these conditions have not been met.

Moreover, Western Industrial has experienced considerable difficulty in obtaining the requisite wetlands approval. After the discovery of wetlands on Section 2 in 1986, the Rhode Island Department of Environmental Management (DEM) entered into a consent agreement with Western Industrial which limited development of Section 2. In December, 1987, DEM and the United States Army Corps of Engineers (Army Corps) issued cease and desist orders against Western Industrial concerning pre-

liminary road cut work undertaken in violation of the consent agreement. Shortly after the 1987 action, Western Industrial and the Army Corps entered into a consent decree resolving the matters raised in the Corps' cease and desist order.

In 1990, the United States of America filed a civil enforcement action against Western Industrial alleging that Western Industrial had discharged fill material in violation of the Clean Water Act. Western Industrial, in January, 1991, entered into a consent decree with the United States which required Western Industrial to obtain an after-the-fact permit application concerning its road construction through Section 2. Although the Army Corps has not yet acted on Western Industrial's application for an after-the-fact permit, the United States Environmental Protection Agency has recommended denial of the application.

At trial, both parties presented testimony by expert witnesses who had independently appraised the value of the land taken by plaintiff's easements. Each appraiser agreed that the highest and best use of the land is for industrial purposes. However, the appraisers disagreed as to the percentage loss in value assigned to the easement areas and whether the land should be valued as single buildable industrial lots or as one large undivided industrial tract.

Plaintiff's expert appraiser, Thomas O. Sweeney, valued the property as a single, industrial-zoned tract to arrive at a per acre value of $45,000.00. In his opinion the entire tract of 80.8 acres had a fair market value of something in excess of 3.6 million dollars. Sweeney determined that the establishment of the temporary and permanent easements would cause a loss equal to 12% of the fair market value of the land within the easement. In the case of the perpetual easement, the land area was 1.759 acres, having an appraised value of $79,155.00. Sweeney concluded that the damage to the value of the land subject to the permanent easement amounted to $9,500.00, and the damage to the value of the land subject to the temporary easement

is $8,100.00. It was his opinion that the total damages are $17,600.00.

Defendant's expert appraiser, Paul F. Cunningham, valued the property as an approved subdivision of buildable industrial lots and used the direct sales comparison method to arrive at a per square foot value of $3.15 as the fair market value of the land subject to the easement, or more than 11 million dollars for the entire tract. Cunningham claimed that plaintiff's permanent easement will cause direct damages in the amount of $93,342.00 and severance damages of $114,000.00 for the loss of two lots caused by the taking. Additionally, Cunningham claimed severance damages for redesign costs totalling approximately $10,000.00 and severance damages amounting to $12,015.00 for expenditures needed to construct a road across the fifteen foot portion of plaintiff's easement that extends beyond the Narragansett easement. Finally, Cunningham valued the loss attributed to the temporary easement as $24,891.00. His opinion was that the total damages were $254,248.00. Thus the evidence presented by Western Industrial's expert appraiser and Tennessee Gas's expert appraiser varied from a low of $17,600.00 to a high of $254,248.00, a difference of $236,648.00.

On May 18, 1989, the Federal Energy Commission granted Tennessee Gas Pipeline Company a certificate of Public Convenience and Necessity authorizing construction of a 36 mile high-pressure natural gas pipeline from Worcester County, Massachusetts to a southern terminus in Cranston, Rhode Island. The Natural Gas Act, 15 U.S.C. § 717f(h), requires that "the practice and procedure in any action or proceeding for [eminent domain] in the district court of the United States shall conform as nearly as may be with the practice and procedure in similar action or proceeding in the courts of the State where the property is situated." Rhode Island law, therefore, controls the issues in this case. *See Mississippi River Transmission Corp. v. Tabor*, 757 F.2d 662, 665 n. 3 (5th Cir. 1985) (applying Louisiana law to condemnation action pursuant to 15 U.S.C. § 717f(h));

*Ozark Gas Transmission Sys. v. Barclay,* 10 Ark.App. 152, 662 S.W.2d 188 (1983) (applying Arkansas law in action pursuant to 15 U.S.C. § 717f(h)).

### Valuation

■ Just compensation in condemnation cases is based on fair market value of land at the time of the taking. *E.g., J.W.A. Realty, Inc. v. City of Cranston,* 121 R.I. 374, 399 A.2d 479, 482 (1979); *O'Donnell v. State,* 117 R.I. 660, 370 A.2d 233, 236 (1977). Courts base fair market value on "the most advantageous and valuable use." *Sweet v. Murphy,* 473 A.2d 758, 761 (R.I. 1984). Western Industrial bases its claimed fair market value of the entire tract of 80.8 acres, totalling more than $11,000,000.00, on the sale or use of the property as separate buildable industrial lots. Western Industrial argues that this is the proper valuation because industrial subdivision development is the highest and best use of Section 2.

■ Potential use may be considered as evidence of the highest and best use provided the landowner establishes that the probability of the potentiality occurring is "reasonably definite and is neither speculative nor remote." *See Palazzi v. State,* 113 R.I. 218, 224, 319 A.2d 658, 662 (1974); *United States v. 8.41 Acres of Land,* 680 F.2d 388, 394 n. 8 (5th Cir.1982).

■ Western Industrial has failed to establish a reasonable probability that Section 2 will be put to its potential use in the near future. The facts reveal that the Planning Commission preliminarily approved Section 2, Phase II in 1983, approximately 8 years ago. Western Industrial, however, has yet to obtain an approved final plat map for this proposed development. Furthermore, at the time of trial, Section 2 had not been actually divided into lots, and the only improvements on the land consisted of underground water and sewer connections in addition to preliminary road cuts in Phase I. Although Section 2, Phase I has received final approval subject to various conditions, Western Industrial has failed to satisfy most of these conditions. Considering the current undeveloped state

of Section 2 and the lack of final development plans, it would constitute mere speculation to value Section 2 as separate buildable lots.

■ Courts are not at liberty to engage in speculation and conjecture in determining future uses. *Palazzi,* 113 R.I. at 224–25, 319 A.2d at 662; *see also Arkansas Louisiana Gas Co. v. Cates,* 10 Ark.App. 426, 664 S.W.2d 897, 897–98 (1984); *United States v. 620.00 Acres of Land,* 101 F.Supp. 686, 689 (W.D.Ark.1952) (speculative elements should be excluded as guides to valuation). Before making a final determination of the value of Section 2, Western Industrial's own expert testified that he had to subtract anticipated selling, marketing, and road construction costs to arrive at an appraised value for the land. Such costs associated with dividing the property into lots, laying out streets, and selling the lots at some unknown time in the future are too uncertain and conjectural to enter into the computation of just compensation. *Arkansas Louisiana Gas Company,* 10 Ark.App. 426, 664 S.W.2d at 899; *see also L'etoile v. Director of Public Works,* 89 R.I. 394, 153 A.2d 173, 177 (1959) (court excludes testimony that landowner intended to convert apartments into doctors' offices because costs of alteration, increased rentals, and potential tenants would be "pure speculation").

■ Western Industrial has failed to establish that the probability and timing of actual subdivision is "reasonably definite" and "neither speculative nor remote." *See Palazzi,* 113 R.I. at 224, 319 A.2d at 662. Certainly there is no evidence that the tract would be sold as separate industrial lots "in the near future" as required by Rhode Island law. *See id.* at 224–25, 319 A.2d at 662. Therefore, it is the property as a whole that must be valued rather than the individual lots into which it might be divided. *See United States v. 8.41 Acres of Land,* 680 F.2d 388, 395 (5th Cir.1982); *Arkansas State Highway Comm'n v. Watkins,* 229 Ark. 27, 313 S.W.2d 86, 89 (1958). All of the purported comparable sales used by Western Industrial's expert appraiser

involved individual subdivided lots of between 1½ to 3 acres in size. Because Western Industrial's expert based its appraisal on comparable sales of subdivided lots, its valuation is fundamentally flawed.

Although Tennessee Gas's expert correctly relied on comparable sales of larger industrial parcels, Tennessee Gas's comparables suffer from several defects as well. For example, the most recent comparable sale utilized by Tennessee Gas's expert occurred in December of 1988. The actual condemnation was almost a year later on November 15, 1990. By contrast, all of the comparable sales used by Western Industrial's expert occurred after July of 1989, closer to the date of condemnation, suggesting the potential for a rising market. Not one of the comparables used by Tennessee Gas's expert relates to property located within the City of Cranston; whereas all of Western Industrial's comparable sales relate to Cranston property located within the immediate vicinity of Section 2, indicating some interest in the local market for industrial development. Furthermore, Tennessee Gas's expert relied upon comparable sales of tracts of land that ranged between 14 and 84 acres. The two smaller tracts of 14 and 21 acres yielded prices under $50,000.00 per acre; while the tracts closer in size to the tract at issue here yielded prices over $60,000.00 per acre. Considering these discrepancies, it is unclear exactly how Tennessee Gas arrived at a value of $45,000.00 per acre.

■ Thus, neither Western Industrial's valuation of the land as approximately 11 million dollars or Tennessee Gas's valuation of the land as approximately 3 million dollars is particularly persuasive. In reality, the fair market value lies somewhere between the two extremes suggested by the parties. Considering all of the circumstances, the fair market value of the property is determined to be $70,000.00 per acre.

*Measure of Damages*

■ Once fair market value is established, the next inquiry concerns the actual property interest seized as well as any diminution in the value of the remaining property as a result of the taking in order to determine the appropriate damages. *See, e.g., Parrillo v. Director of Public Works,* 112 R.I. 427, 312 A.2d 198, 203 (1973); *Hetland v. Capaldi,* 103 R.I. 614, 240 A.2d 155, 157 (1968).

As noted previously, there is a wide divergence concerning the effect of the permanent easement. Tennessee Gas's expert, Sweeney, argued at trial that both the temporary and the permanent easement would reduce the value of the land subject to the easements in Section 2 by 12%, resulting in damages of $9,500.00 for the permanent easement and $8,100.00 for the temporary easement. Western Industrial's expert, Cunningham, agreed with Sweeney that the temporary easement would result in a 12% decrease in the value of Section 2. Cunningham, however, argued that the permanent easement will cause a 90% loss in value to Section 2. Cunningham further contends that Western Industrial is entitled to severance damages and road redesign costs.

■ Both Tennessee Gas and Western Industrial agree that the temporary easement will result in a 12% decrease in the value of the land subject to the easement in Section 2. Since the parties agree that the temporary easement brings about a 12% diminution of the value of the property and since the value of the temporary easement unencumbered is $106,680.00, the damage attributable to the temporary easement is $12,801.60.

■ The court rejects Western Industrial's claim that the permanent easement will reduce the fair market value of Section 2 by 90%. The permanent easement lies virtually inside the Narragansett easement, which already subjects this particular area of land to substantial building and use restrictions. For example, the preexisting Narragansett easement gives Narragansett Electric Company the right to keep the easement area clear of trees, underbrush, and other structures as necessary for the safe and proper operation of power lines. Tennessee Gas's permanent easement,

therefore, will result in only de minimis impact on Western Industrial's already severely restricted use of the surface area above this easement. *See United States v. 122.63 Acres of Land*, 526 F.Supp. 539, 542 (D.Mass.1981) (easement had de minimis effect due to zoning regulations and preexisting restrictive covenant). Western Industrial's claim that it will suffer a 90% loss in value is wide of the mark. The loss appears to be in the order of 20%. Applying this figure to the value of the permanent easement yields a total of $24,626.00.

■■■■ Finally, because it is improper to value Section 2 as separate buildable lots, Western Industrial is not entitled to severance damages for potential lot loss. Additionally, Western Industrial is not entitled to damages due to road construction costs over the fifteen foot portion of the Tennessee Gas easement that extends outside the Narragansett easement because this particular element of damages was included in the damage calculation relating to the permanent easement. Recalculation of these damages as added road costs would amount to a duplication of damage claims.

In conclusion, the Tennessee Gas easements will not substantially impact upon Western Industrial's use of the surface area of the easement once the pipeline installation is complete. As a result, Western Industrial is entitled to compensation of $12,801.60 for the temporary easement and $24,626.00 for the permanent easement.

Default judgments are hereby entered against those defendants who failed to appear at trial.

### Prejudgment Interest

■■■■ The fifth amendment and the Rhode Island Constitution require the payment of interest as an element of just compensation when the date of taking of the property precedes the payment of the award. *See Smyth v. United States*, 302 U.S. 329, 353–54, 58 S.Ct. 248, 252, 82 L.Ed. 294 (1937); *Atlantic Refining Co. v. Director of Public Works*, 104 R.I. 436, 244 A.2d 853, 855 (1968). In Rhode Island, a landowner is entitled to interest at the statutory rate from the date of taking. *Ferrazzano v. Flanders*, 462 A.2d 368, 369 (R.I.1983). The current statutory rate of interest in Rhode Island is 12%. On November 15, 1990, this court granted Tennessee Gas condemnation rights to perpetual and temporary easements across defendant's property. Therefore, Western Industrial is entitled to interest at a rate of 12% on the damage award accruing from the date of taking until the date of entry of the final order.