GREGORY M. CLIFFORD & another[1] *vs.* ALGONQUIN GAS
TRANSMISSION COMPANY.

Middlesex. October 5, 1992. - December 16, 1992.

Present: LIACOS, C.J., ABRAMS, NOLAN, LYNCH, & GREANEY, JJ.

*Eminent Domain*, Expert testimony, Damages. *Damages*, Eminent domain. *Evidence*, Expert opinion, Value. *Value.*

At the jury trial of an action for assessment of damages following a taking by eminent domain of a gas pipeline easement over the plaintiffs' property, the judge did not exceed the bounds of his discretion in admitting in evidence a subdivision plan of the property which had received preliminary approval and was in the final stage of preparation at the time of the taking. [814-816]

At the trial of an action for assessment of damages following a taking by eminent domain of a gas pipeline easement over the plaintiffs' property, the judge did not exceed the bounds of his discretion in permitting the plaintiffs' expert witness to testify as to the value of the property as individual house lots according to the "subdivision development" or "lot" method of appraisal, where the evidence warranted the judge in ruling that the plaintiffs' proposed subdivision plan was not so speculative as to preclude its submission to the jury. [816-821]

CIVIL ACTION commenced in the Superior Court Department on February 27, 1989.

The case was tried before *Patrick F. Brady*, J.

The Supreme Judicial Court granted a request for direct appellate review.

*Edwin J. Carr* (*Robert P. Snell* with him) for the defendant.

*Harris S. Gorab* (*Lawrence M. Slater* with him) for the plaintiffs.

---

[1]Edna R. Clifford.

LYNCH, J. On October 14, 1988, the defendant, Algonquin Gas Transmission Company (Algonquin), recorded a taking by eminent domain of a thirty-foot wide easement totalling 1.18 acres across an undeveloped parcel of land consisting of 73.591 acres owned by the plaintiffs, Gregory M. Clifford and Edna R. Clifford. On February 27, 1989, the Cliffords filed an action for assessment of damages in accordance with G. L. c. 79, § 14 (1990 ed.). Prior to trial, Algonquin filed a motion in limine seeking, inter alia, the exclusion of subdivision development plans of the property, along with expert testimony valuing the property as individual house lots according to the "subdivision development" or "lot" method of appraisal. The judge denied the motion, and ultimately a jury returned a verdict for the plaintiffs in the amount of $700,000. Algonquin filed a timely notice of appeal. We granted its application for direct appellate review, and we now affirm.

There was evidence from which the jury could have found the following facts: In September, 1985, Gregory Clifford purchased for $190,000, 73.591 acres of undeveloped woodlands and wetlands (property) in Hopkinton that abutted Ash Street, an existing public way.[2] Clifford was attracted to the site because of its proximity to Hopkinton center (approximately one-third of a mile) and because the property was included within a new sewer district to be built in Hopkinton. Prior to purchasing the property, Clifford hired an engineering company to examine the property and to perform soil tests. As a result of the tests, Clifford believed he could subdivide and develop the property into thirty-five to forty single-family house lots in the areas that were not wetlands.

Due to the size of the subdivision, the Cliffords decided to develop the property in two phases. The property was subject to a 100-foot wide Boston Edison Company easement that ran overhead and bisected the property from north to south. Thus, in the first phase (phase I), the Cliffords divided up a

---

[2]In December, 1985, Gregory Clifford transferred the property to himself and Edna R. Clifford as tenants by the entirety.

portion of the land on the east side of the Edison easement into four lots. They planned to run a temporary cul-de-sac between the lots from Ash Street which would later be extended into a full road when the entire property was developed.[3] On December 22, 1986, the Cliffords obtained a mortgage of $325,000 on the property from the Home National Bank of Milford to finance the development. On January 21, 1987, the Cliffords received conditional approval from the planning board of Hopkinton (board) to build phase I of the project which they called Old Mill Estates.[4] Thereafter, the Cliffords secured the necessary permits, and began construction of phase I.

On April 27, 1987, the Cliffords submitted to the board a preliminary plan to develop the second phase (phase II) of the Old Mill Estates with an extended cul-de-sac, which the board rejected. The Cliffords then instructed their engineers to draw up a second preliminary plan.

Early in November, 1987, the Cliffords learned that Algonquin planned to build a gas transmission line across their property. On November 20, 1987, the Cliffords submitted the second phase II preliminary plan to the board for approval. In December, 1987, Gregory Clifford met for the first time with a representative of Algonquin about the pipeline and gave him a copy of the same phase II plan that the Cliffords had submitted to the town for approval.[5] There then began a long succession of unfruitful negotiations regarding the location of the pipeline on the Cliffords' land, and regarding the compensation to be paid to the Cliffords for the taking.[6]

---

[3]The planning board of Hopkinton (board) prohibits permanent dead end streets and culs-de-sac.

[4]Approval was conditioned on, inter alia, the Cliffords' promise to extend the cul-de-sac as further lots were developed, and their promise to cooperate in providing access to adjacent subdivisions.

[5]In the plan, Clifford included specifications that would have placed the pipeline outside the phase I subdivision and inside phase II where it would have the least impact on his phase II subdivision.

[6]The Algonquin plans placed the pipeline in an area that did not conform to the Cliffords' plan.

While the negotiations between the Cliffords and Algonquin were proceeding, the Cliffords received final approval from the board for three of the phase I lots, which they sold between July, 1989 and March, 1990.[7] On January 25, 1988, the board gave preliminary approval to phase II, conditioned on the development of a coordinating road network between the Cliffords' subdivision and two proposed adjoining subdivisions. On May 25, 1988, the Cliffords hired a new engineer to draw up definitive plans for the development of phase II, including the placement of both the road to the adjoining subdivisions and the pipeline.

The parties were not able to reach agreement on the placement of the pipeline. On October 14, 1988, Algonquin recorded a taking by eminent domain of a permanent right of way and easement within the property.[8]

The Cliffords filed a definitive plan for phase II in April, 1989, in which they requested a waiver to build the required road at an eleven per cent grade over the pipeline. The board rejected the plan.[9] In June, 1989, Gregory Clifford met with the Hopkinton town planner and presented another plan in which he attempted to avoid crossing the pipeline by using a permanent cul-de-sac. The Cliffords, however, were told that the board would not approve the plan. The Cliffords then instructed their engineers to attempt to convince Algonquin to

---

[7]Lots 2 and 3 sold for $75,000 and $90,000, respectively. Lot 1, on which the Cliffords had constructed a house, sold for $337,900. The Hopkinton conservation commission rejected Lot 4 under authority of the Massachusetts wetlands protection act, G. L. c. 131, § 40 (1990 ed.).

[8]Gregory Clifford states that he sent his engineer to the site where the pipeline was being installed in order to have it lowered in an approximate area where the road was to be constructed. The engineer was told it was too late and that the plans could not be changed.

[9]The board based its decision mainly on the report of its engineer. In his report, the engineer cited numerous problems that the Cliffords needed to resolve before they could develop phase II. The engineer strongly recommended that the board not waive its nine per cent grade requirement. At the end of the report, the engineer recommended "major revisions and additions to the submittal should be required prior to definitive plan approval. We are also of the opinion that all of the identified design concerns may be able to be resolved."

lower the pipeline.[10] When this was unsuccessful, the Cliffords abandoned development of phase II.

At trial, both sides agreed that the highest and best use of the property was for residential subdivision purposes. The judge, pursuant to his ruling on the defendant's motion in limine, permitted the Cliffords' expert to testify to the value of the phase II subdivision pursuant to the "subdivision development" or "lot" approach to valuation. The expert stated that this approach was valid because the property was unique and, therefore, no comparable sales existed. He assumed the lots would sell over a two-year period at an average price of approximately $132,000 and arrived at a gross sales value for all lots that he estimated would sell in each quarter, from which he deducted the costs associated with development.[11] From that figure he deducted a fifteen per cent developer's profit and arrived at an amount that a buyer would pay for the land in its undeveloped condition. The expert then estimated the value of the property in its posttaking condition, deducted this from his pretaking estimate and thus computed the damages caused by the taking to be $825,000.

Algonquin cross-examined the plaintiffs' expert extensively on the availability of comparable property sales, on the viability of the development plan, and on his valuation figures. Algonquin's expert in turn testified that there were comparable property sales available for the analysis, that the Cliffords' expert used improper valuation figures, and that he estimated damages arising from the taking to be $12,100. The

---

[10]On June 9, 1989, the Cliffords' engineer sent Algonquin a copy of the definitive subdivision plans for phase II that the board had rejected due to the eleven per cent grade of the road. In the letter the Cliffords' engineer requested relocation of the pipeline and inquired about the procedure for doing so. Algonquin responded on July 28, 1989, with a letter outlining seventeen conditions for relocating the pipeline.

[11]They encompassed costs of construction and engineering, including sewer and road installation; real estate taxes paid every six months; five per cent sales commissions to brokers; $2,500 legal and accounting costs for each lot; four per cent cost inflation per year; cost of a construction bond to the town; discount rate of fifteen per cent for inflation over the two-year period.

judge instructed the jury that, "unless you find something to be true to the facts, then, of course, the expert opinion is not of any significance."[12]

Algonquin appealed from the verdict on both the admission of the subdivision plan of April, 1989, for phase II and the expert testimony valuing the Cliffords' property based on the "lot" method of appraisal. In addition, Algonquin argues that the jury's verdict was contrary to the weight of the evidence and excessive as a matter of law, and that the judge abused his discretion in not granting a new trial. We disagree and affirm the judgment.

We must determine at the outset whether the judge properly admitted: (1) a prospective subdivision development plan of the property that was begun prior to, but completed after, the taking; and (2) expert testimony valuing the property according to the "subdivision development" or "lot" method of valuation.

1. *Admission of the subdivision plan.* This court has stated that the standard is whether a trial judge exceeded the bounds of sound discretion in admitting evidence of the effect of the taking. *Aselbekian* v. *Massachusetts Turnpike Auth.*, 341 Mass. 398, 401 (1960). Uses which explore an unexecuted plan of development in unreasonable detail, and those that are "unduly speculative or conjectural," should be excluded. *Skyline Homes, Inc.* v. *Commonwealth*, 362 Mass. 684, 686 (1972). *Southwick* v. *Massachusetts Turnpike Auth.*, 339 Mass. 666, 669 (1959). *Tigar* v. *Mystic River Bridge Auth.*, 329 Mass. 514, 517-519 (1952). Whether a particular use should be taken into account "is a matter for demonstration, not mere guesswork . . . and the judge has a margin of ultimate discretion in deciding whether the proof has gone far enough to warrant submission of the issue to the jury" (citations omitted). *Skyline Homes, Inc.* v. *Commonwealth, supra* at 687.

---

[12]He continued, "In other words, if you don't find those particular facts the expert based his opinion on to be so, then the opinion that the expert gave you would not be of any significance or importance to you and that I think should be quite apparent to you."

One leading authority has stated:

"In situations where an owner had taken some steps toward development although not having reached the point of physically changing the character of the land, such evidence has been admitted to aid in assessing damages and show a market value above that which it otherwise might have had. However, this evidence has not been admitted where it was found that successful development of the land would be improbable or where the evidence, such as a plat, was hastily drawn up for the mere purposes of trial tactics." 4 Nichols, Eminent Domain § 12B.14[1], at 12B-155 — 12B-157 (rev. 3d ed. 1990).

In *Brush Hill Dev., Inc.* v. *Commonwealth*, 338 Mass. 359 (1959), the Commonwealth took a portion of the plaintiff's land that was already under development as a residential subdivision. At the time of the taking, the Milton planning board had given conditional, but not final, approval to the subdivision plan. This and other plans were excluded by the judge. However, the court stated:

"The trial judge . . . in his discretion *could have admitted* evidence of the progress made by the petitioner at the time of the taking toward realizing the land's potential for its most logical use, progress which would have been likely to have greatly affected the value of the land in its then state to any person interested in purchasing it at that time, if there had been no taking" (emphasis added). *Id.* at 363.

In *Aselbekian, supra*, a substantial portion of a dairy farm was taken and the plaintiffs had no plans for building a subdivision. However, the plaintiffs' expert was permitted to testify on the damage to the potential development of the land for house lots and allowed to introduce as an exhibit a plan "showing how the petitioners' property could be developed into lots." *Id.* at 400. The court held that the judge properly

admitted the plan, but cautioned, "The plan, of course had no proper place in this case except to illustrate the physical possibility that the land in 1955 could have been divided into lots . . . a matter which we think could have been stated with less risk of misleading the jury without use of a plan." *Id.* at 401.

In *Dover Hous. Auth.* v. *George*, 107 N.H. 202 (1966), the Supreme Court of New Hampshire applied a standard similar to that enunciated in *Brush Hill Dev., Inc.* v. *Commonwealth, supra*, in holding that a prospective development plan was properly admitted in evidence where the judge instructed the jury throughout the trial that the measure of damages was "the market value of the property as a unit." *Dover Hous. Auth.* v. *George, supra* at 204. The court stated that cross-examination "adequately exposed the uncertainties and expense standing in the way of realization of the values [of the lots in a developed state]." *Id.* at 205.

The Cliffords in the instant case received preliminary approval from the board for a subdivision plan for phase II. Their engineer was preparing final phase II plans when Algonquin took its pipeline easement. There was evidence to suggest that Algonquin's easement prevented the Cliffords from proceeding with their development plans. The Cliffords had also developed and sold three lots in phase I.

Therefore, we conclude that the plan did not portray a use that was unduly speculative or conjectural and that it was not an abuse of discretion for the judge to have admitted the April, 1989, subdivision plan.

2. *Admission of the expert's testimony based on the "lot" method of valuation.* This question is closely related to, but different from, that previously discussed. The problem is explained as follows in 4 Nichols, Eminent Domain, *supra* at § 12B.14[1], at 12B-159:

"Determining the market value presents little problem where the land has actually been subdivided. In that case, there being little speculation as to use, the lots may be valued individually. Where the land is pure raw

land, with no improvements at all having been made, but there was a showing of adaptability for subdivision purposes, valuation will generally be on a whole subdivision basis. The real problem arises where the condition of the land is in neither of these two extreme states. When the land is at some mid point between raw land with no action toward subdivision taken, and a realized or nearly realized subdivision, the cases are in conflict and no clear rules emerge. The cases are decided on their particular facts, giving weight to the surrounding circumstances involved in the particular case."

Many courts have refused to adopt the "lot" method approach to valuation. 4 Nichols, Eminent Domain, *supra* at § 12B.14[1][a], at 12B-163. These courts reason that the expense of clearing off and improving the land, laying out streets, dividing it into lots, advertising and selling the same, holding it and paying taxes and interest until all the lots are disposed of is too uncertain and conjectural to be computed. The accepted rule is that the land will be considered in its present condition as a whole, with consideration given to any increment or enhancement in value due to the property's present adaptability to subdivision development. *Id.* at § 12B.14[1][a], at 12B-168. See, e.g., *Tennessee Gas Pipeline Co.* v. *104 Acres of Land More or Less, in Providence County of R.I.*, 780 F. Supp. 82, 86 (D.R.I. 1991) ("lot" method rejected where owner had failed to establish reasonable probability that property would be put to its potential use as separate buildable industrial lots in near future, as required for potential use to be considered as evidence of fair market value under Rhode Island law);[13] *Contra Costa Water Dist.* v. *Bar-C Properties*, 5 Cal. App. 4th 625 (1992)

---

[13]Although the facts in *Tennessee Gas Pipeline Co.* v. *104 Acres of Land More or Less, in Providence County of R.I.*, 780 F. Supp. 82 (D.R.I. 1991), bear some similarities to those before us, there are also important differences. In the nine years since preliminary approval of phase II of the subdivision was granted to the date of the taking, the owner did not get final approval for his proposed development. The court held, therefore, that the owner had failed to establish a reasonable probability that the property

(unless landowner passed threshold from having a purely speculative development to one that can be realized, then "lot" method of valuation inappropriate);[14] *Matter of City of N.Y.*, 28 N.Y.2d 465, 470 (1971) ("capitalization of estimated income" approach rejected, since "[e]laborate forecasts of income from nonexistent structures on land which needed large physical change to be usable for the purpose not a proper measure of fair market value"); *Raymond* v. *Chittenden County Circumferential Highway*, 604 A.2d 1281, 1284 (Vt. 1992) (raw land, with little or no improvement or preparation for subdivision, may not be valued as if land were in fact subdivision; value must be set as of date of taking when land is in raw state without planned improvements).

The United States Courts of Appeals for the Sixth and Ninth Circuits and the Court of Claims, however, have approved the use of the "lot" method in appropriate circumstances. In *United States* v. *100 Acres of Land, More or Less, in Marin County, Cal.*, 468 F.2d 1261, 1266 (9th Cir. 1972), the court stated:

> "The Government strenuously objected to the owner's method of arriving at the fair market value of the condemned property and argues here that the trial court erred in admitting such evidence. It is claimed that the method is speculative in the extreme and has no relation to the market because it does not consider the seller or competing investment opportunities. We do not agree. The evidence admitted was based on facts obtained as a result of the subdivision on which the condemned prop-

would be put to its potential use as separate buildable industrial lots in the near future.

[14]In *Contra Costa Water Dist.* v. *Bar-C Properties*, 5 Cal. App. 4th 625 (1992), the property owners had obtained tentative plan approval from the county and received a preliminary report from the Department of Real Estate. They had not, however, performed any work on the land. The Court of Appeal held that the owners had not sufficiently crossed the threshold toward the sale of finished lots so as to render the "developer's approach" an acceptable method of valuation.

erty was a part and partially under development at the time it was taken. Even though the subject property was largely unimproved, it was an integral part of a subdivision being developed and was the next unit to be completed."

In *United States* v. *47.3096 Acres, etc., in Oxford Township, Erie County, Ohio*, 583 F.2d 270, 272 (6th Cir. 1978), that court adopted the Ninth Circuit rule as the better view, stating:

"There is some authority for the proposition that valuation evidence based on the lot method of appraisal should never be admitted in condemnation cases involving unimproved raw land. . . . We think the better view, however, is that a lot method appraisal can be admitted in appropriate cases if the proponent offers credible evidence of the costs of subdivision — e.g., the expense of clearing and improving the land, surveying and dividing it into lots, advertising and selling, holding it, and paying taxes and interest until all lots are sold. See *United States* v. *100 Acres*, 468 F.2d 1261, 1266 (9th Cir. 1972). Cf. *United States* v. *478.34 Acres*, 578 F.2d 156, 159 (6th Cir. 1978)." (Citation omitted.)

See also *Drakes Bay Land Co.* v. *United States*, 459 F.2d 504, 506 (Ct. Cl. 1972).

In *Commonwealth* v. *McCready*, 371 S.W.2d 485 (Ky. 1963), the Supreme Court of Kentucky approved the use of the "lot" method of valuation on an undeveloped parcel at trial, stating:

"The witnesses testified to the value of the land for subdivision purposes and then made appropriate allowances for developing it. One witness, in describing how he arrived at a value, said that he took into account the number of lots that could be produced, comparable sales in similar subdivisions, allowance of a reasonable time in which to sell the lots, and cost of development of the

subdivision, including installation of utilities and paved streets. The procedure used by appellees' witnesses was similar to the procedure used by appellant's witnesses, who treated the land as subdivision lots instead of as farm land. The witnesses testified to varying values. The jury was thus left to fix a value based on the testimony heard. There being no showing of bias or prejudice, the verdict should stand."

Our review of the decisions here and in other jurisdictions confirms the view that no clear rule exists and that admissibility turns on the particular facts and the extent to which the development had progressed toward completion. 4 Nichols, Eminent Domain, *supra.* Here there was evidence that the development as originally contemplated was to be accomplished in two phases. Final approval had been obtained for three out of four lots in the first phase and all of the approved lots had been sold. In phase II, the Cliffords had performed soil tests, obtained financing to begin construction, and received approval of a preliminary plan. The engineer that the board assigned to assess the Cliffords' final plans stated that, although he found many design concerns, he thought they could be resolved. See note 9, *supra.*

The extent of the Cliffords' development of phase II at the time of the taking is a matter of some dispute. The jury could have believed, however, that the taking prevented the complete development of phase II. In order for the Cliffords to obtain final approval of phase II the board required that they build a road that would provide an access to the subdivision and would tie in the adjoining subdivisions. The board also required that the road not exceed a nine per cent grade. Algonquin's intended placement of the pipeline crossed the Cliffords' road. To get over the pipeline the Cliffords would have to build the road at an eleven per cent grade. The Cliffords could not convince Algonquin to lower the pipeline and the board refused to approve construction unless the road did not exceed the nine per cent grade.

In these circumstances, we conclude that the judge did not abuse his discretion in admitting the expert's testimony. In *Aselbekian* v. *Massachusetts Turnpike Auth., supra* at 401, the· court stated:

> "The problem of the trial judge is to avoid unreasonably restricting the efforts of the owner fairly to show the effect of the taking upon the market value of the property at the time of the taking . . . without permitting damages to be inflated by unduly detailed and confusing proof of speculative future uses of property having no very direct relationship to market values at the time of the taking." (Citations omitted.)

There was enough evidence to permit the judge to rule that the proposed subdivision plan was not so speculative or remote as to preclude its submission to the jury.

The jury were taken on a view of the Cliffords' property. They were, thus, less likely to be confused as to the actual condition of the property when the expert testified concerning the proposed subdivision at trial. The judge properly instructed the jury that they need not accept an expert's opinion if they did not find those facts on which the expert based his testimony to be true, and that they were not to consider potential future uses of the property that were "unduly speculative or conjectural." See *supra* at 814 & note 12.

Algonquin's other attacks on the Cliffords' expert go to the weight, not the admissibility of the evidence. Algonquin challenged the expert's opinion extensively on cross-examination and in its case-in-chief. Algonquin offered its own valuation. In admitting the subdivision plan and testimony valuing the property based on it, the trial judge did not exceed the bounds of a sound discretion. *Aselbekian* v. *Massachusetts Turnpike Auth., supra* at 401.

It is apparent from our discussion above that the defendant's claims of error based on its motions for a required finding and a new trial are also without merit.

*Judgment affirmed.*