**ALGONQUIN GAS TRANSMISSION CO., Plaintiff,**

v.

**60 ACRES OF LAND, MORE OR LESS, IN BROCKTON, PLYMOUTH COUNTY, MASSACHUSETTS, et al., Defendants.**

**Civ. A. No. 92–11678–ZRK.**

United States District Court,
D. Massachusetts.

May 10, 1994.

---

450

Michael J. McHugh, Nancy M. McNally, Rich, May, Bilodeau & Flaherty, Boston, MA, for Algonquin Gas Transmission Co.

Michael Mack, Brockton, MA, for 14.32 Acres of Land, more or less, in Brockton, Plymouth County, Massachusetts.

William I. Cowin, Friedman & Atherton, Boston, MA, for Kelly C. Kelly.

Michael Mack, Robert G. Clark, III, Office of Robert G. Clark, Jr., Brockton, MA, for Joseph G. Gerry.

## MEMORANDUM AND ORDER

### REGARDING MOTION IN LIMINE OF ALGONQUIN GAS TRANSMISSION COMPANY

#### *(DOCKET NO. 70)*

KAROL, United States Magistrate Judge.

Plaintiff, Algonquin Gas Transmission Company ("Algonquin"), brought this eminent domain case pursuant to § 7(h) of the Natural Gas Act, 15 U.S.C. § 717f(h), and Rule 71A of the Federal Rules of Civil Procedure. Algonquin sought to condemn certain interests in real property located in southeastern Massachusetts in connection with the construction of a natural gas pipeline authorized by the Federal Energy Regulatory Commission and to have the court determine the just compensation owed to the owners of the condemned property interests. The in-

terests that Algonquin sought to condemn were permanent and temporary easements.

Algonquin has settled with all landowners on whose property it has taken an easement, except defendant Joseph G. Gerry. The only issue that separates Algonquin and Gerry is the amount of just compensation that Algonquin must pay for the diminution in the value of Gerry's property caused by the taking of the pipeline easements. William C. Bearce, an appraiser retained by Gerry to assess the damages to Gerry's property caused by the taking and to testify as an expert witness at the trial of this case, has filed a report in which he seeks to value that property as if it were a completed residential subdivision, even though virtually no steps to develop the property have been taken and it is presently raw land. Algonquin has filed a motion in limine to exclude Bearce's testimony as an expert witness. For the reasons set forth below, Algonquin's motion is ALLOWED.

## I. *FACTS*

### A. *The Gerry Property*

The parties agree that the Gerry property, at the time of the taking, consisted of 52.49 acres of undeveloped land in a residentially-zoned area in the City of Brockton. Pl.'s Ex. A–2, at 1; Def.'s Ex. B, ¶ 8; Def.'s Mem in Opp'n at 2, 11. Most of that land was apparently used for farming, but two parcels, Plots 87 and 94 on the Assessor's Map, containing a total of approximately 18 acres, were unsuitable for farming and lay fallow. Def.'s Ex. B, ¶¶ 4, 5. Algonquin's easements, consisting of a permanent easement of 1.09 acres [1] and a temporary easement of .91 acres, run across these parcels. Def.'s Exs. A–2; K–1. Gerry has owned Plots 87 and 94 since he purchased them in 1947 and 1952. Def.'s Ex. B, ¶ 4. He claims that he knew from the time he purchased the land that it was better suited for residential development than for farming. Def.'s Ex. B, ¶¶ 6, 7. Nonetheless, between the time of his initial purchase in 1947 and the time of the taking 45 years later in 1992, Gerry did nothing to develop the property other than obtain Planning Board

approval for a single lot in 1992. *See* Def.'s Ex. B, ¶ 32. Gerry attributes his prolonged period of inactivity to a variety of causes, including a general reluctance on the part of banks to finance the development of residential subdivisions after 1987, a lack of personal financial resources, and his concern that large scale development would have jeopardized tax benefits he was receiving under Mass.Gen.Laws ch. 61A for operating a farm and would have resulted in a "prohibitive" increase in his real estate taxes. *See* Def.'s Ex. B, ¶¶ 27–31. Gerry claims that, as a result of these factors, he finally decided in 1990 to extend the nearest road into Plots 87 and 94 "piece-meal, on a one-lot-at-a-time basis using proceeds of sale of each lot for construction of the extension of the subdivision." Def.'s Ex. B, ¶ 31. Neither he nor Bearce says anything about the time period over which this one-lot-at-a-time plan was to have been implemented, other than that it was Gerry's intention to accomplish all of this sometime in the "near future." *See* Def.'s Ex. K, ¶ 8.

Whatever the reason for the inactivity, no financing to develop the subdivision was ever obtained, or, as far as the record reveals, even applied for. No roads were ever built or extended into the proposed subdivision, and no plans were ever drawn up for the purpose of doing so. No surveying, engineering, clearing, or physical modification of the land of any kind was ever undertaken; no utilities were ever installed; and with the exception of the single lot for which approval was obtained in 1992, no approvals were ever sought or obtained for the proposed subdivision. No plan for the proposed subdivision was ever prepared, and no document ever existed that shows the ten or eleven residential lots into which Bearce now says that, but for the taking, Plots 87 and 94 could have been subdivided. No lawyers or accountants were ever engaged or ever rendered any professional services in connection with the proposed subdivision; and, except for Bearce's own affidavit and appraisal report, which contain little more than Bearce's own

---

1. Algonquin claims that the permanent easement consists of only .83 acres, while Gerry maintains that it comprises 1.09 acres. *Compare* Pl.'s Ex. A–2, at 33 *with* Def.'s Ex. K–1. For purposes of analysis, it does not matter which party is correct.

unsupported conclusions,[2] there is nothing in the record to suggest that any financial or marketing analysis of any kind was ever done or even attempted, on either the cost or the revenue side of the equation, to determine the economic feasibility of developing a residential subdivision of any size on the subject property. In short, the subject property was barely further along toward development in 1992 than it was when Gerry purchased it as raw land in 1947 and 1952.

## B. The Taking

At the end of July 1992, over Gerry's opposition, Algonquin moved for an order seeking immediate entry onto the Gerry property for the purpose of constructing the pipeline. By Order dated August 13, 1992, Algonquin's motion for immediate entry was allowed, effective August 7, 1992. That is the date, therefore, that shall be used for the purpose of determining Gerry's damages.

## C. The Bearce Report

Bearce's appraisal report, which was submitted as Exhibit 1 to Bearce's February 1994 affidavit, Def.'s Ex. K, is dated July 30, 1992. After customary preliminary statements regarding the nature of the engagement, a description of the subject property, and a review of some of the methods generally available to appraisers for valuing property, Bearce states his opinion and the basis for it as follows:

As previously stated, building lots similar in size, shape and neighborhood influence in the general vicinity of the subject property have sold for between Sixty Thousand Dollars ... and Seventy–Five Thousand Dollars ... per lot. The subject property is so-called "raw" land. That is, there are no streets or utilities available at this time. By using a Residual Approach to value, that is, estimating the cost of erecting streets, installing utilities, and conforming to the requirements of the Zoning Laws of the City of Brockton. [sic] It is this appraisers [sic] opinion that the cost to develop a single lot is approximately Twenty Thousand Dollars.... The subject property has the potential of being developed into approximately ten building lots. Your appraiser estimates that the Fair Market Value of a finished lot on a finished road would be approximately Fifty–Five Thousand Dollars.... Accordingly, 10 building lots × $55,000.00 per lot equals Five Hundred Fifty Thousand Dollars.... Less the cost of development, 10 building lots × $20,000.00 per lot equals Two Hundred Thousand Dollars.... In my opinion, the damages created by the taking of this land ... is Three Hundred Fifty Thousand Dollars....

Def.'s Ex. K–1.

Except for some additional conclusory statements by Bearce in his affidavit, this is the entirety of the basis for Gerry's claim that his damages resulting from the taking amount to $350,000.[3] Omitted entirely are any statements of the basis for Bearce's opinions that the cost to develop each lot is approximately $20,000; that the property could physically be subdivided into approximately ten lots; that all necessary approvals for ten lots could be obtained in the near future, if at all; or that there is a market for ten lots at $55,000 per lot in the near future, if at all. Perhaps more significantly, Bearce does not explain how even the most qualified experts in the many fields encompassed by this one report could know any of these things with a reasonable degree of certainty before the land had been surveyed, roads had been laid out, subdivision plans had been drawn, engineering (preliminary or detailed) had been performed, bids had been solicited and received, pro formas had been prepared, or any approvals had been sought or obtained. In addition, Bearce does not even

---

2. For example, Bearce states in his affidavit: The subdivision and sale of the property as contemplated was/is unquestionably financially feasible by reason of having compared lots in the general location, my knowledge of the costs of development, my knowledge of the cost of site preparation, engineering, development, and the marketing and sales of residen-

tial subdivisions including other such parcels affected by M.G.L.c. [sic] 61A.
Def.'s Ex. K, ¶ 4.d.

3. The court confirmed at oral argument on March 31, 1994 that Bearce's report and affidavit contain the entire substance of the testimony Bearce would give if he were permitted to testify.

touch on the critical subject of how long it would take to develop the property, obtain all necessary approvals, or complete the sale of all ten lots; nor does he appear to have taken into account legal, accounting, marketing, and carrying costs (including, for example, the cost of sales commissions, advertising, and interest and taxes until all lots were sold). Finally, he does not appear to have made any effort to adjust his estimates to reflect the substantial inefficiencies that would be associated with Gerry's anticipated one-lot-at-a-time approach.[4]

## II. ANALYSIS

■ Under the express provisions of the statute pursuant to which this action is brought, § 7(h) of the Natural Gas Act, 15 U.S.C. § 717f(h), a federal district court must look to and apply the "practice and procedure" followed in similar proceedings in the courts of the state where the property is situated. *See Columbia Gas Transmission Co. v. Exclusive Natural Gas Storage Easement,* 962 F.2d 1192, 1197–99 (6th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 659, 121 L.Ed.2d 585 (1992); *Tennessee Gas Pipeline Co. v. 104 Acres of Land,* 780 F.Supp. 82, 85 (D.R.I.1991). Thus, in this proceeding, the court must apply the practice and procedure that are followed in eminent domain cases in Massachusetts state court.[5]

■ The leading Massachusetts case on the admissibility in an eminent domain case of expert testimony regarding the value which undeveloped land would have as a fully developed residential subdivision is *Clifford v. Algonquin Gas Transmission Co.,* 413 Mass. 809, 604 N.E.2d 697 (1992). As the *Clifford* case makes clear, at least two related but analytically distinct issues are raised whenever a landowner attempts to introduce such evidence. First, there is the question whether the feasibility of converting undeveloped land into a residential subdivision is too inherently speculative for the factfinder to consider. *See id.* at 814, 604 N.E.2d at 700–01. Second is the question whether, even assuming the land as a whole can be valued on the basis of its potential use as a residential subdivision, valuation may be on the basis of the so-called "lot" method, in which a value is separately assigned to each individual lot, net of the cost of developing such lot. *See id.* at 816–17, 604 N.E.2d at 702.

In *Clifford,* the Supreme Judicial Court (the "SJC") held, on the basis of easily distinguishable facts, that the trial judge's decision to permit the landowner's expert to use the lot method was not an abuse of discretion. *Id.* at 821, 604 N.E.2d at 704. Among other distinguishing factors, the landowners in *Clifford* had actually hired an engineer; performed soil tests; obtained bank financing; divided development of the proposed subdivision into two phases; developed and sold three of four lots in Phase I; prepared, submitted, and obtained preliminary planning board approval of plans for Phase II; and filed definitive plans to build Phase II, which plans were ultimately rejected by the planning board because the defendant's easement had made it impossible to satisfy one of the conditions established by the board in its preliminary approval. *Id.* at 820, 604 N.E.2d at 703–04.

Although the SJC ultimately affirmed the trial judge's decision to permit the expert to

---

4. To cite one example, whatever the cost would be to build a single road connecting all ten proposed lots, surely that cost would be substantially greater if, each time a new lot was under development, a new approval had to be obtained to extend the road, new bids had to be solicited from engineering firms and road construction companies, and new work crews and equipment had to be brought in to do the work. Similar inefficiencies would be associated with all the other necessary tasks associated with the development and sale of each lot.

5. The court assumes that, to be admissible, Bearce's expert testimony must independently satisfy the requirements of the Federal Rules of Evidence, and particularly Rule 702, notwithstanding that Massachusetts "practice and procedure" otherwise govern these proceedings. It is unnecessary to decide this issue, however, because Bearce's testimony is too speculative to satisfy either state or federal standards of admissibility. *See Frymire–Brinati v. KPMG Peat Marwick,* 2 F.3d 183, 186–87 (7th Cir.1993) (a federal district court has an obligation to exclude expert testimony that fails to meet a threshold test of reliability); *Clifford v. Algonquin Gas Transmission Co.,* 413 Mass. 809, 821, 604 N.E.2d 697, 704 (1992) (a Massachusetts court may properly exclude expert testimony based on "unduly speculative" subdivision plan).

use the lot method, it emphasized two points of relevance here. First, the lot method is too inherently speculative to be used except in those cases where development of the subdivision is relatively far along. *Id.* at 816–820, 604 N.E.2d at 702–04. Second, the trial judge has considerable discretion in deciding whether the lot method may be used in a particular case. *Id.* at 821, 604 N.E.2d at 704.

Regarding the first point, the SJC quoted a leading authority:

Determining the market value presents little problem where the land has actually been subdivided. In that case, there being little speculation as to use, the lots may be valued individually. *Where the land is pure raw land, with no improvements at all having been made, but there was a showing of adaptability for subdivision purposes, valuation will generally be on a whole subdivision basis.* The real problem arises where the condition of the land is in neither of these two extreme states. When the land is at some mid point between raw land with no action toward subdivision taken, and a realized or nearly realized subdivision, the cases are in conflict and no clear rules emerge. The cases are decided on their particular facts, giving weight to the surrounding circumstances involved in the particular case.

*Id.* at 816–17, 604 N.E.2d at 702 (emphasis added) (quoting 4 *Nichols on Eminent Domain* § 12B.14[1], at 12B–159 (Julius L. Sackman ed., 3d rev. ed. 1990)).

The SJC then surveyed the cases from a number of jurisdictions and endorsed Nichols' conclusion. The court said:

Our review of the decisions here and in other jurisdictions confirms the view that no clear rule exists and that *admissibility turns on the particular facts and the extent to which the development had progressed toward completion.*

*Id.* at 820, 604 N.E.2d at 703 (emphasis added).

In the present case, there has been virtually no progress toward commencement of the development of a subdivision, let alone its completion. Under these circumstances, it is doubtful that the lot method may be used for evaluation purposes. But even if the rule is not so inflexible to preclude all use of the lot method to value raw land, such use should be restricted to those cases in which the expert has made a thorough study of the situation, documented all sources of information relied upon, identified all the assumptions that were made and explained in detail the bases for all those assumptions, and satisfied the court that the assumptions have a reasonable basis in fact. Conversely, under no circumstances should the lot method be used to value raw land on the basis of an expert's conclusory statements of opinion.

Applying Massachusetts law, therefore, the court doubts that it has discretion to admit Bearce's report and anticipated testimony under the circumstances of this case. Even if the court has some discretion in the matter, however, it finds the Bearce report to be far too speculative, incomplete, and unreliable to permit Gerry to introduce it as evidence of the value of his raw land or to call Bearce as a witness to testify as to its contents.[6]

### III. *ORDER*

For the reasons stated, Algonquin's motion in limine is ALLOWED.

---

**6.** The court realizes that its rejection of the use of the lot method to measure the damages to Gerry's land addresses only one of Algonquin's objections to the Bearce report. There is, however, no need to address any of Algonquin's other objections at this time because Gerry has not indicated that he intends to rely upon any method other than the lot method to measure his damages.