**PORTLAND NATURAL GAS TRANSMISSION SYSTEM and MARITIMES & NORTHEAST PIPELINE, L.L.C. Plaintiffs,**

**v.**

**19.2 ACRES OF LAND, More or Less, in Haverhill, Massachusetts, 11.36 Acres of Land, More or Less, in Haverhill, Massachusetts, 9.29 Acres of Land, More or Less, in Haverhill, Massachusetts, WBC Extrusion Products, Inc., and Fleet Bank of Massachusetts, N.A. Defendants.**

**No. CIV.A.99–11071–PBS.**

United States District Court, D. Massachusetts.

Feb. 27, 2002.

James T. Finnigan, Rich, May, Bilodeau & Flaherty, Michael J. McHugh, Rich, May, Bilodeau & Flaherty, Boston, for Portland Natural Gas Transmission System, Maritimes & Northeast Pipeline, L.L.C., Plaintiffs.

James D. Masterman, Masterman, Culbert & Tully, Boston, for WBC Extrusion Products, Inc., Defendants.

### FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER OF JUDGMENT

SARIS, District Judge.

This is a partial takings case. Plaintiffs Portland Natural Gas Transmission System and Maritimes & Northeast Pipeline, L.L.C. (collectively "Portland") have acquired temporary and permanent easements to install, operate and maintain interstate natural gas pipelines across land in Haverhill, Massachusetts owned by WBC Extrusion Products, Inc. ("WBC") pursuant to the Natural Gas Act, 15 U.S.C. § 717f(h). After a bench trial, the Court finds that the plaintiffs must compensate defendants for the partial taking in the amount of $148,206.00, plus interest from the date of taking.

### I. FINDINGS OF FACT

#### A. *The Taking*

On July 31, 1997, the Federal Energy Regulatory Commission authorized Port-

land to construct, operate and maintain an interstate natural gas pipeline and related facilities along an 18–mile route through the cities of Haverhill and Methuen and the Town of Dracut in northeastern Massachusetts. The project extends north from Dracut, Massachusetts to Maine. A portion of this 18–mile route crosses over Parcels 1 and 2 of WBC's land at 60 Fondi Road in Haverhill. Unsuccessful in its efforts to purchase the temporary and permanent easements over WBC's land necessary to lay the pipeline, Portland commenced this eminent domain action on May 19, 1999.

On July 9, 1999, the Court issued an unopposed Order of Taking by which Portland acquired permanent and temporary easements described in the Condemnation Complaint (Docket # 17) to construct, operate and maintain the gas pipeline on WBC's property. In total, the permanent easements spanned 2.37 acres, and the temporary easements encompassed 2.2 acres.

To build the pipeline, which has a 30″ diameter, Portland destroyed trees and other foliage, excavated along the entire length of the easements acquired, assembled the pipeline and then buried it. Portland requires a minimum of a 3–foot soil cover over the pipe.

## B. *The Property*

In 1985, Wolf Jachimowicz, the principal shareholder and officer of WBC Extrusion Products, purchased land in Haverhill to construct a plant for his company, which manufactures packaging material. The property was desirable because it has good access to major travel routes and is close to New Hampshire. In addition, the City of Haverhill is pro-development, erecting few hurdles to permitting.

WBC's land consists of approximately 76 acres divided into two parcels. Parcel 1, known as the "WBC Industrial Park," contains 58.54 acres. (Def.Ex. 17, Vol.I, p. 32). On September 24, 1986, the City approved the WBC Industrial Park subdivision which created eight industrial lots in Parcel 1. (Ex. 4) As of July 1999, only one of the eight lots (designated as Lot 7) was occupied by WBC. The other seven lots were vacant, raw land, but up for sale. Parcel 2 encompasses 19 acres and is not a part of the WBC Industrial Park. Consisting mostly of wetlands and without street frontage, Parcel 2 was a non-buildable, non-conforming lot as of July 1999.

The easements affect three portions of the WBC property.

- *Lot 1*, 9.29 acres in size, is encumbered with a permanent easement of 1.21 acres and a temporary easement of 1.01 acres.

- *Lot 8*, which encompasses 11.36 acres, contains a permanent easement of 0.69 acres and a temporary easement of 0.58 acres.

- *Parcel 2*, which spans 19.20 acres, is subject to a permanent easement of 0.47 acres and a temporary easement of 0.51 acres.

The WBC Industrial Park caters to a niche market of high-end industrial facilities conforming to high aesthetic standards, and bars lower-cost industrial structures. To achieve this goal, WBC established an Owner's Association in May 1999 which adopted a set of restrictive covenants on lot development and operation that run with the land. The preamble provides that they were adopted "[t]o encourage, enhance and protect the value, attractiveness and desirability of the Park as a first class industrial park development...." Article Five of the Covenants contains specific restrictions on use of the Park, including a provision requiring that site engineering, use, landscape and signage plans be submitted to and approved

by the Owner's Association. The Covenants also contain nine pages of Rules and Regulations Concerning Approval of Design and Construction. Unlike several other industrial parks in the vicinity, the WBC Covenants exclude metal-sided buildings and external storage facilities. Owners must start construction of approved projects within 18 months after purchase.

### C. *Marketing*

WBC hired John Chiungos, a commercial real estate broker, to sell the lots. In his opinion, the park was desirable because it was well located, and municipal utilities (except for sewage disposal) were available. As of July 1999, the market for industrial properties was improving because the excess inventory of existing buildings had been absorbed, and firms were looking for buildable land.

Chiungos' sales efforts met with mixed success. Although WBC received an offer on Lots 3 and 6 before July 1999, the deal did not close. Lots 4 and 5 sold after July 1999. As of the time of trial, WBC had received an offer on Lot 2, but had not yet decided whether to accept it. Meanwhile, WBC received no offers at all on Lots 1 and 8 either before or after July 1999. Indeed, Chiungos received no inquiries whatsoever about Lot 1, although he did show Lot 8 several times.

The properties had certain characteristics which limited their marketability before the installation of the pipeline. First, the upscale covenants precluded metal buildings and outside storage and required compliance with other aesthetic limitations. In the estimation of Chiungos, compliance with the covenants would increase the costs of construction on the WBC Properties by five to ten dollars per square foot. Second, competitive developments had lots nearby with municipal sewer hookup. Although it had other utilities, WBC did not have a municipal sewer connection and therefore relied on an on-site septic tank. Finally, the access road to Route 121, Hilldale Avenue, was deficient because until 1999, it was a gravel road. It was impassable in the wintertime prior to June 1998, and not adequately upgraded until 2000.

Nonetheless, with a booming economy and limited inventory in the area, the owners of WBC apparently wore rose-colored glasses when pricing the two encumbered lots, even after news of the pipeline had been leaked. The prices listed for the lots increased steadily and, in fact, rather dramatically after 1998:

| List Price | Lot 1 | Lot 8 |
|---|---|---|
| 6/98 | $295,000 | $165,000 |
| 1/1/99 | $380,000 | $230,000 |
| 12/99 | $480,000 | $310,000 |
| 6/1/00 | $510,000 | $350,000 |

### D. *Highest and Best Use*

As of the date of the taking, the highest and best use of Lots 1 and 8 is as industrial lots. The highest and best use of Parcel 2 is as open space, its current use.

### E. *Requirements*

As part of its operation and maintenance of the pipeline, Portland adopted a set of rules for construction activity in the vicinity of the pipeline, related facilities and rights of way. These rules of Portland are entitled "Requirements for Construction On or Near Company Facilities," dated August 24, 1998 ("Requirements"). The Requirements further define the scope of the easement taken. Insofar as the Requirements limit the private use of Lots 1 and 8 of the WBC Industrial Park, they diminish their market value.

Among those rules imposed by the Requirements are the following:

§ 2.3 Copies of any proposed plans or drawings for work within the pipeline

right of way shall be submitted to [Portland] for review.

§ 3.1 No building or obstruction may be erected within the pipeline easement. . . .

§ 3.5 No drainage swales and no reductions in grade are permitted on the pipeline easement without prior written approval from [Portland]. . . .

§ 3.6 Proposed grades shall not exceed maximum allowable slopes of 4:1 parallel to the pipeline(s) and 8:1 perpendicular to the pipeline(s).

§ 3.8 Parking areas should be planned so as to avoid covering the pipeline easement if at all possible.

§ 3.9 No roads, driveways, foreign lines, or utilities may be installed parallel to the pipeline(s) within the pipeline easement. . . .

§ 3.13 If, in the sole judgment of [Portland], the . . . developer's proposed plans necessitate the installation of casing pipe and/or other alterations . . . to protect [Portland's] pipeline(s), the . . . owner[,] and/or developer shall pay [Portland] the estimate cost prior to [Portland] beginning the alterations.

Section 6.4 of the Requirements also provides that Portland may set additional requirements at any time:

Approval by [Portland] of the proposed design drawings does not relieve the landowner/developer from further compliance with any and all Company specifications . . . [Portland] *reserves the right to set forth additional requirements if deemed necessary.* (emphasis added).

The Requirements potentially affect use of the land beyond the pipeline easement itself. Section 5.1.1 requires notification of any blasting proposed within "300 feet of [Portland's] facilities."

Portland paints itself as the picture of flexibility in applying the Requirements and insists that it would permit certain uses, such as parking lots or access roads, on or near the pipeline easement. Nonetheless, as it concedes, it would have to do a project-by-project review to ensure safe and effective operation of the pipeline. Thus, from the viewpoint of the prospective purchaser, the Requirements introduce a hassle factor which would affect the purchase price.

## II. RULINGS OF LAW

### A. Applicable Law

The Takings Clause of the Fifth Amendment prohibits the government from taking private property for public use without just compensation. *Palazzolo v. Rhode Island,* 533 U.S. 606, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001). Even a minimal "permanent physical occupation of real property" requires compensation under the Clause. *Id.* (citing *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 427, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982)). The Takings Clause requires that just compensation be paid "to put the owner of condemned property 'in as good a position pecuniarily as if his property had not been taken.'" *United States v. 564.54 Acres of Land,* 441 U.S. 506, 510, 99 S.Ct. 1854, 60 L.Ed.2d 435 (1979) (quoting *Olson v. United States,* 292 U.S. 246, 255, 54 S.Ct. 704, 78 L.Ed. 1236 (1934)).

Although condemnation of private property under the Natural Gas Act is a matter of federal law, 15 U.S.C. § 717f(h) provides that a federal district court must look to and apply the "practice and procedure" followed in similar proceedings in the courts where the property is situated. Generally speaking, state law governs compensation issues in eminent domain proceedings involving private interests.

*See Georgia Power Co. v. 138.30 Acres of Land,* 617 F.2d 1112, 1121 n. 5 (5th Cir. 1980) (en banc) (applying state law to questions concerning compensation under the Federal Power Act); *Algonquin Gas Transmission Company v. 60 Acres of Land,* 855 F.Supp. 449, 453 (D.Mass.1994) (holding that the admissibility of expert testimony was governed by state law); *Tennessee Gas Pipeline Company v. 104 Acres of Land,* 780 F.Supp. 82, 85 (D.R.I. 1991) (holding that state law controlled damage issues). *But cf. Southern Natural Gas Co. v. Land, Cullman County,* 197 F.3d 1368, 1374 (11th Cir.1999) (holding that under Fed.R.Civ.P. 71A federal procedure governs condemnation actions brought under the Natural Gas Act).

### B. *Partial Takings*

As the parties agree, since the taking is located in Massachusetts, the Court relies on the Massachusetts law of eminent domain to determine just compensation in this condemnation action. Mass. Gen. L. ch. 79, § 12, which governs partial takings, provides:

> The damages for property taken under this chapter shall be fixed at the value thereof before the recording of the order of taking, and in case only part of a parcel of land is taken there shall be included damages for all injury to the part not taken caused by the taking. . . .

"As a general rule, in the case of a partial taking, the landowner is entitled to compensation measured, not by the fair market value of the portion taken, but by the diminution in the fair market value of his land caused by the partial taking." *Kane v. Hudson,* 7 Mass.App.Ct. 556, 559, 389 N.E.2d 737, 740 (1979); *In re Boston Edison Co.,* 341 Mass. 86, 93–94, 166 N.E.2d 902, 907 (1960) (measuring compensation by evaluating the value of the land before and after taking). A factfinder must con-

sider not only the value of the property taken, but also the effect on the remainder. *See Kane,* 7 Mass.App.Ct. at 559, 389 N.E.2d 737. This commonly used approach to determine the compensation of a partial taking is known as the before-and-after rule:

> Value of entire parcel before taking minus value of remainder area after taking, equals just compensation; value of land taken plus (value of remainder area before taking minus value of remainder area after taking) equals just compensation.

Julius L. Sackman, 4A *Nichols on Eminent Domain,* § 1402[1][b] (rev.3d ed.2001). The measure of damages is generally the fair market value of the land immediately before the taking minus its fair market value immediately after the taking. *See Hero Int'l Corp. v. Commonwealth,* 35 Mass.App.Ct. 911, 913, 618 N.E.2d 1386 (1993).

### C. *Fair Market Value*

Fair market value is defined as "the highest price which a hypothetical willing buyer would pay to a hypothetical willing seller in an assumed free and open market" when the property has been exposed to the market for a reasonable period of time. *See Newton Girl Scout Council, Inc. v. Massachusetts Turnpike Auth.,* 335 Mass. 189, 193, 138 N.E.2d 769, 773 (1956). *See also Epstein v. Boston Housing Auth.,* 317 Mass. 297, 299–300, 58 N.E.2d 135, 137 (1944); *Tigar v. Mystic Bridge Auth.,* 329 Mass. 514, 517, 109 N.E.2d 148, 150 (1952). In cases involving the assessment of the fair market value of unimproved tracts of land suitable for subdivision, the Court should determine the factors a prospective purchaser would consider, including "briskness of demand." *United States v. 158.24 Acres of Land,* 696 F.2d 559, 564 (8th Cir.1982).

In determining the fair market value of the property, the Court may consider features that would "figure materially in the reckonings of the willing buyer and seller, envisaged as intelligent business people expecting to pay and receive hard cash." *Skyline Homes, Inc. v. Commonwealth*, 362 Mass. 684, 687, 290 N.E.2d 160, 162 (1972). *See also* Jacques B. Gelin & David W. Miller, *The Federal Law of Eminent Domain* § 4.1 (1982) (elaborating on the applicable legal standard); 4A *Nichols* at § 14A.01[2] ("Because it is proper for the trier to consider all elements which are a natural and proximate result of the taking and which could legitimately affect the price that a prospective purchaser would pay for the land, facts of the impact upon the remainder during the course of construction, although temporal in nature, may be the basis for an overall diminution in value of the remainder and therefore, the basis for damage.").

Some courts have held that "any factor, including public fear, which impacts on the market value of land taken for a public purpose may be considered to explain the basis for an expert's valuation opinion. Whether this fear is objectively reasonable is irrelevant to the issue of full compensation in an eminent domain proceeding." *Florida Power & Light Co. v. Jennings*, 518 So.2d 895, 899 (Fla.1987). *See also Ryan v. Kansas Power & Light Co.*, 249 Kan. 1, 5, 815 P.2d 528, 533 (1991) (evidence of fear in marketplace held admissible regarding value of property); *City of Santa Fe v. Komis*, 114 N.M. 659, 662–663, 845 P.2d 753, 756–757 (1992) (same); *Criscuola v. Power Auth. of the State of New York*, 81 N.Y.2d 649, 652, 602 N.Y.S.2d 588, 621 N.E.2d 1195, 1196 (N.Y.1993) (same). These cases teach that fair market value is not to be determined in a rarefied realm of abstract calculation, but from the perspective of a hypothetical buyer in the real world—even if her perception of value is based partially on misinformation or (arguably) exaggerated fears about uncertain future events.

Other courts, in the same or similar circumstances, have held that the anticipation of increased interference or potential hazards on the land remaining after a taking, which one court has labeled "stigma damages," can be considered in assessing severance damages. *See, e.g., Vector Pipeline, L.P., v. 68.55 Acres of Land*, 157 F.Supp.2d 949, 957 (N.D.Ill.2001) (holding that "stigma damages" were properly included in calculation of severance damages, where proximity of gas pipeline could trigger fears about possible mishaps); *United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1078 (5th Cir.1996) (holding that increased fear of flooding was a matter that factfinder could properly consider in assessing severance damages); *United States v. Robertson*, 354 F.2d 877, 881 (5th Cir.1966) (recognizing viability of claim for severance damages based on prospective buyers' likely fear of hazards arising from construction of power line carrying high voltage electricity); *United States v. 33.5 Acres of Land*, 789 F.2d 1396, 1399–1400 (9th Cir.1986) (holding that local buyers' fear of possible knapweed infestation legitimately affected calculation of severance damages); *United States v. Easement and Right of Way*, 405 F.2d 305, 309 (6th Cir. 1968) ("[W]e are not convinced that certain segments of the buying public may not remain apprehensive of these high voltage lines, and therefore might be unwilling to pay as much for the [adjacent] property as they otherwise would."). *See also* Vitauts M Gulbis, Annotation, *Fear of Powerline, Gas or Oil Pipeline, or Related Structure as Element of Damages in Easement Condemnation Proceeding*, 23 A.L.R.4th 631 (1983) (citing numerous cases with similar holdings).

■ Fair market value is to be determined in light of the property's highest and best use. The finder of fact may consider the values of potential uses to which the property may be put, with discounts for the likelihood of their being realized and for their futurity. *Skyline Homes* at 686–87, 290 N.E.2d 160; *Ford v. Worcester,* 339 Mass. 657, 662, 162 N.E.2d 264, 268 (1959); *R.H. White Realty Co., Inc. v. Boston Redevelopment Auth.,* 3 Mass.App.Ct. 505, 507, 334 N.E.2d 637, 638 (1975); *Tigar,* 329 Mass. at 517–19, 109 N.E.2d 148.

### D. *Easements*

■ Simply put, the measure of value in condemnation proceedings where the estate taken is less than the fee or absolute ownership, such as an easement, is the difference between the fair market value with and without the burden. *See United States ex rel. Tennessee Valley Auth. v. Robertson,* 354 F.2d 877, 880 (5th Cir. 1966).

■ "The landowner is entitled to assume, in the condemnation suit, that the taking authority will make the full use 'physically possible of any easement or land described in the taking certificate.' " 4A *Nichols,* at § 14A.06[3] (quoting *2,953.15 Acres of Land v. United States,* 350 F.2d 356, 360 (5th cir.1965)). When the condemnor limits the use of its easement after the taking has occurred, this limitation can limit the damages recoverable, but only if the limitation is lawfully enforceable by the condemnee. 4A *Nichols* at § 14A.06[3].

The taking authority is free to limit the scope of access either before the taking or, with the landowner's agreement, after the taking. *Mugar v. Massachusetts Bay Transp. Auth.,* 28 Mass.App.Ct. 443, 445, 552 N.E.2d 121, 123 (1990). "Absent such action, 'payment must be made for the rights which have been acquired, not for the more limited use to which the condemnor may intend to devote the property taken.' " *Id.* (quoting 4A *Nichols* at § 14.15).

■ To calculate the value of the property actually taken as a result of the permanent easements, the Court must consider not only the market value of the property and the amount of land taken, but also the percentage of the original bundle of ownership rights that the owner retains on the encumbered land. *See, e.g., United States v. 122.63 Acres of Land,* 526 F.Supp. 539, 542 (D.Mass.1981) (awarding only $500.00 in compensation after finding that permanent easement had only de minimus effect on owner's use of pasture land); *Tennessee Gas Pipeline Co. v. 104 Acres of Land,* 780 F.Supp. 82, 88 (D.R.I. 1991) (holding that permanent easement arising from condemnation of pipeline easement reduced property value by 20%); *Texas Gas Transmission Corp. v. Hebert,* 207 So.2d 368, 371 (La.App.1967) (holding that permanent easement on land containing natural gas pipeline reduced value of directly encumbered land by 75%); *Southwestern Elec. Power Co. v. Conger,* 307 So.2d 380, 384 (La.App., 1975) (same); *Texas Gas Transmission Corp. v. Broussard,* 196 So.2d 620, 622 (La.App.1967) (same).

■ Takings of temporary easements are measured differently. A landowner must be compensated for the loss of use of property taken by a temporary easement and any impairment of access to the property during the period of construction. *Miczek v. Commonwealth,* 32 Mass.App. Ct. 105, 108, 586 N.E.2d 1004, 1005 (1992) (involving temporary slope easement). Some courts have held that the damages are equal to the rental value of the property for the period of occupation. 4 *Nichols*

at § 12E.01. This is commonly measured by the rental value of the property as a whole. *See Paddock v. Town of Durham,* 110 N.H. 106, 108, 261 A.2d 438, 441 (1970); 4A *Nichols* at § 14.2462. *Cf. Kimball Laundry Co. v. United States,* 338 U.S. 1, 8, 69 S.Ct. 1434, 1439, 93 L.Ed. 1765 (1949) (holding that the proper measure of compensation in a temporary taking is the rental value that probably could have been obtained).

### E. *Miscellaneous*

Damages are to be measured as of the date of the taking, which in this case is July 9, 1999. *United States v. 50 Acres of Land,* 469 U.S. 24, 24, 105 S.Ct. 451, 83 L.Ed.2d 376 (1984). The landowner, while nominally the defendant in a condemnation action, has the burden of proving any diminution in the value of its property caused by the taking. *See, e.g., 33.5 Acres of Land,* 789 F.2d at 1400; *United States v. 125.07 Acres of Land,* 753 F.Supp. 1034, 1037 (D.Mass.1991).

The Fifth Amendment and Massachusetts law require the payment of interest as an element of just compensation when the date of taking of the property precedes the payment of the award. *See Smyth v. United States,* 302 U.S. 329, 353–54, 58 S.Ct. 248, 82 L.Ed. 294 (1937); *North Shore Realty Trust v. Commonwealth,* 434 Mass. 109, 115, 747 N.E.2d 107, 111 (2001); *Roberts v. Worcester Redevelopment Auth.,* 53 Mass.App.Ct. 454, 462–63, 759 N.E.2d 1220, 1226 (Mass.App. Ct.2001).

### III. *DISCUSSION*

With these general principles in mind, I turn to the valuation of the takings.

### A. *Per Acre Value of the Lots in July 1999*

The first step in the analysis of fair market value is to determine the per acre value of Lot 1, Lot 8, and Parcel 2 in July 1999. Mr. Peter E. Stanhope, the real estate appraiser relied upon by WBC, calculated the per-acre value of Lot 1 to be $57,000.00 (rounded from $56,973.00), based on a comparison of the property with similar lots in the region. Using a similar method, Mr. Steven R. Foster, the real estate appraiser relied upon by Portland, estimated the per-acre value of Lot 1 to be $50,000.00.

The Court finds Portland's estimate of $50,000.00 for Lot 1 more reasonable. The list price for Lot 1 was $380,000.00 on January 1, 1999, and $480,000.00 on December 1, 1999—the two bookend listing dates closest to the date of the taking, July 9, 1999. When divided by the total acreage of 9.29 acres, these figures translate into per-acre prices of $40,904.00 and $51,668.00, respectively. If the Court were to accept WBC's analysis, the adjusted value of Lot 1 would be substantially more than its listing price for either of the two dates adjacent to the date of the taking. There is no evidence that WBC deliberately set the list price of Lot 1 below its true market value; that WBC ever discounted the list price to reflect the (actual or expected) effect of the taking; or that properties similar to Lot 1 were likely to sell for more than their list prices during the same time period. Moreover, there was a lack of demand for these lots that would affect the hypothetical purchaser's assessment of their market value. Finally, Lot 5 was sold by deed dated April 3, 2000 for the list price. Therefore, the Court finds Portland's estimate a more credible estimate of market value for Lot 1.

Mr. Stanhope, WBC's expert witness, calculated the per-acre value of Lot 8 to be 65% that of Lot 1, yielding a value of $37,000.00 based on his estimates.

(Def.Ex. 17, Vol.I, p. 68). Mr. Foster, Portland's expert witness, estimated Lot 8's per-acre value to be $30,000.00. (Foster Report, p. 89). The list price for Lot 8 was $230,000.00 on January 1, 1999, and $310,000.00 on December 1, 1999. When divided by Lot 8's total acreage of 11.36 acres, these figures translate into per-acre prices of $20,246.00 and $27,289.00, respectively. In light of the list prices, the Court finds $30,000.00 a reasonable estimate of the fair market value of Lot 8.

Finally, based on a comparison of the property with similar lots in the region, Mr. Stanhope calculated the per-acre value of Parcel 2 to be $983.00 per acre. The plaintiffs presented no evidence to the contrary, and the Court has no information before it regarding the list price of this lot. The Court finds the value of Parcel 2 to be $983.00 per acre.

## B. *Permanent Easements*

Although it is clear that the plaintiffs' easement rights extend far enough to enable them to "construct, operate and maintain an interstate natural gas pipeline" on WBC's land, the inherent imprecision of this standard makes the degree of potential infringement on property rights difficult to ascertain. The parties' estimates of the percentage diminution in value of the land burdened by the permanent easement differ substantially.

Defendants place considerable emphasis on the construction Requirements which, they argue, render the encumbered land all but worthless to WBC. They argue that since there is no delineated limitation to the easement rights taken, the Requirements must be construed broadly in assessing damages. In sum, defendants contend that the correct percentage diminution is 100%, and in any event should be adjudged no less than 90%.

Portland consistently downplays the Requirements, arguing that many of the Requirements are waivable or impose little *de facto* burden. For example, Mr. Frank Gessner, the right-of-way manager for the pipeline, testified that Portland tried to be responsive to the needs of lot owners and in many cases could accommodate parking lots, small shrubbery, or extra cover in the easement area on a case-by-case basis. Arguing that the easement areas could still be utilized for "parking, access, and open space as well as for floor area and lot coverage calculations" after the taking, and that any buildings constructed could be shifted outside of the easement area, the plaintiffs urge that the property interest being taken by the easement represents no more than 50% of the original property value.

The Court is persuaded that regardless of the "true" burden imposed by the Requirements, a potential buyer who has read them would be likely to fear a substantial degree of infringement on the land encumbered by a permanent easement. Even the plaintiffs' expert, Mr. Foster, conceded that the Requirements (the existence of which he was unaware before trial) could reduce the value of the easement property by as much as 75%. Yet to assume that the defendants' rights would be almost entirely extinguished—as the defendants insist—is also unwarranted. The evidence demonstrates (and the Requirements do not contradict) that the encumbered areas could be used as a parking lot or open space—likely uses even without the permanent easements—with relatively little interference. In light of these considerations, the Court finds the percentage of ownership rights taken by the plaintiffs on the land covered by the easement to be 75%.

The diminution in value of WBC's property as a result of the permanent ease-

ments (not including the diminution of value in the remainder) therefore is calculated to be $45,375.00 for Lot 1 ($50,000/ acre × 1.21 acres × .75); $15,525.00 for Lot 8 ($30,000/acre × 0.69 acres × .75); and $347.00 for Parcel 2 ($983/acre × 0.47 × .75). The total diminution resulting from the permanent easements, therefore, is $61,247.00 excluding damages to the remainder.

## D. *The Remainder*

Finally, this Court must determine the diminution in value (if any) of the remaining property. Once again, the parties present dramatically opposing estimates of the dollar value of the property interests taken. Defendants, in reliance on Mr. Stanhope's report—that in turn relied on conceptual site plans prepared by Ja–By engineering—contend that the easements on Lots 1 and 8 effectively reduced the footprint (in square feet) of the buildings that those lots can accommodate. Specifically, they hypothesize that the maximum building size on Lot 1 was reduced from 80,500 to 61,250 square feet, while the maximum size on Lot 8 was reduced from 67,400 to 36,000 square feet. (Def. Ex. 17, Vol. II, Addenda pp. A33–A36.). In contrast, the plaintiffs, relying on the report of Mr. Foster—who, in turn, relied on conceptual site plans by EarthTech—assert that the presence of the easements does not alter the maximum building size on either lot. (Foster Rep. p. A–3—A–4.)

The Court finds that the defendants have not carried their burden of showing, by a preponderance of the evidence, that the existence of the easements would re-duce the maximum building size on Lot 1 or Lot 8. The experts' projections concerning the size of the buildings which could be constructed consistent with the easement, the Requirements and market demand are too conjectural and hypothetical.[1]

However, there is little doubt that the easements have caused diminution in the value of the remaining land. A reasonable buyer, after reading the "Requirements for Construction on or Near Company Facilities," would almost certainly anticipate that building in the vicinity of the easement areas of Lots 1 and 8 would involve extra administrative "hassle," and possible extra construction expenditures. For example, the Requirements contain restrictions on slope grading (Paragraph 3.6), crossing the pipeline with heavy equipment (Paragraph 3.7), storage facilities (Paragraph 3.11), and the timing of pipeline excavation (Paragraph 3.14).

Portland's repeated attempts to downplay the importance of these Requirements—and to suggest that in practice, they impose only a trivial degree of inconvenience—are unpersuasive. Potential buyers may reasonably fear that the presence of underground pipelines on their property may make commercial construction more costly and inconvenient on the adjacent land. *See e.g., Clifford v. Algonquin Gas Transmission Co.,* 413 Mass. 809, 820, 604 N.E.2d 697, 703 (1992) (given local planning board's requirement that road not exceed a nine percent grade, necessity of building road at eleven percent grade over gas pipeline precluded building road on encumbered area). Such appre-

---

1. In their proposed exhibits submitted to the court on November 9, 2001, Defendants submitted an Amendment to Mr. Stanhope's Appraisal Report substantially revising their estimates of the before and after values of lots 1 and 8. In a pre-trial motion filed November 13, plaintiffs, vehemently asserting unfair sur-prise, argued that the report should be excluded for failure to comply with Fed.R.Civ.P. 26(a)(2)(c). This Court granted the plaintiffs' motion and excluded the supplementation because it was untimely disclosed and because the tardy disclosure would unfairly prejudice Portland.

hensions certainly could affect the market price of Lots 1 and 8 over and above the diminished value of the land physically occupied. (Since Parcel 2 is unbuildable, this analysis does not apply.)

The Court finds that the sole proven damages resulting from the permanent taking are the "stigma damages" associated with building on the unaffected land in Lots 1 and 8. In light of the likely effect of the Requirements on potential construction, the Court estimates a diminution of market value equal to 10% of the total value of the remaining land (i.e., that portion not subject to the permanent easement). For Lot 1, therefore, damages are calculated to be $40,400.00 (8.08 acres × $50,000/acre × 0.10). For Lot 2, severance damages are calculated to be $32,010.00 (10.67 acres × $30,000/acre × 0.10). Because Parcel 2 is not considered buildable land, there are no severance damages. Total damages to the remainder therefore amount to $72,410.

### E. *Temporary Easements*

Although both experts agreed that the temporary easements lasted two years, they disagreed on the methodology for valuing them. WBC's expert, Mr. Stanhope, assumed that "[t]he effect of the temporary easement is the extension of the development of the subject by the legal two-year period of the temporary easement." (Def.Ex. 17, Vol.I, p. 49). This is because typically buyers would (1) purchase a substitute property, (2) delay their purchase until the disruption is concluded, or (3) pay a discounted price to reflect the loss in utility during the easement term. He uses a discounted cash flow analysis of the three lots to show the market value effect of this two-year delay. After factoring in "holding costs," an annual 3% appreciation rate, and the weighted average cost of capital, Mr. Stanhope estimates the val-

ue of the temporary easements on all three lots to be $103,116.00.

This valuation approach, while reasonable, has the following flaw. Even if a buyer had been prepared to purchase the lots on the date of the taking (which is dubious given the scant market interest in the lots), it is implausible that construction would have begun on the very same day the property was purchased. In the best of circumstances, there would be a substantial time lag between the purchase of property and beginning of construction. Even without an easement, a purchaser of raw land would have to expect up to eighteen months from the time of purchase until construction commenced. In light of the evidence (albeit sparse) that construction projects can take twelve to eighteen months of planning before the first shovel goes into the ground, there is simply no evidence in the record to support the assumption that the temporary easements probably caused a two-year delay in development.

Plaintiffs' expert, Mr. Foster, took a different tack to valuation, stating: "The valuation of temporary easements is generally based on the income which would be required to support the market value of the underlying land. The total damages for one temporary easement are calculated using this income or rent and the length of time the easement will be [in] effect." (Foster Report at 56). To calculate the value of the temporary easements on each lot, Mr. Foster multiplies the per-acre value of the land covered by the temporary easement by an annual rate of return of 10%.

The Court finds that Mr. Foster's general approach—which calculates the rental value of the land affected by the temporary easement—is the more appropriate method to calculate the value of the temporary easements. Because the record does

not contain adequate information to adjust the rental values for inflation during the 1999–2000 period, the Court will adjust only for real appreciation.

The fair rental value of the temporary easement on Lot 1 is found to be $5050.00 (1.01 acres × $50,000.00/acre × 0.10) **MULTIPLY BY 0.9 BECAUSE OF PERMANENT 10% DIMINUTION** in 1999 and $5202.00 in 2000 (incorporating Mr. Stanhope's assumption of 3% real appreciation), for a two-year total of $10,252.00. Using identical logic, the fair rental value of the temporary easement on Lot 8 is found to be $1740.00 (0.58 acres × $30,000/acre × 0.10) **MULTIPLY BY 0.9 BECAUSE OF PERMANENT 10% DIMINUTION** in 1999, and $1792.00 in 2000, for a two-year total of $3532.00. Mr. Stanhope's report stated that speculative land parcels such as Lot 2 did not appreciate over this period. Therefore, the fair rental value of the temporary easement on Parcel 2 is found to be $50.00 (0.51 acres × $983/acre × 0.10) in both 1999 and 2000, for a total of $100.00. The total value of the temporary easements, therefore, amounts to $13,884.

The one problem with Foster's methodology is that it ignores the effect of the temporary easements on Lots 1 and 8 as a whole—i.e., development on both lots was essentially prevented for the entire two-year period. According to the covenants, construction on the buildings had to begin eighteen months after the hypothetical purchase. Therefore, because construction on the pipeline would delay construction of the buildings, a prospective purchaser would factor into the price a delay in development of at least six months. Using the rental approach, WBC must be compensated for the impact of the partial taking on the remainder of Lots 1 and 8 (i.e., the portion not encumbered by the easements) by calculating the value of the use of the lots for the six months of dead time. This amounts to $21,321 for Lot 1 (8.28 acres outside easement) × ($50,000/acre) × (10 percent annual return / 2) × (1.03 adjustment for real appreciation) **CALCULATE SEPARATELY FOR 25% OF PORTION B ACREAGE, AND 90% OF PORTION C ACREAGE, THEN ADD THEM TOGETHER**; and $16,655 for Lot 8 (10.78 acres outside easement) × ($30,000/acre) × (10 percent annual return / 2) × (1.03 adjustment for real appreciation). **CALCULATE SEPARATELY FOR 25% OF PORTION B ACREAGE, AND 90% OF PORTION C ACREAGE, THEN ADD THEM TOGETHER**; The impact on the partial taking on the land not directly encumbered by the easement, therefore, totaled $37,976 for the six-month period. Because Lot 2 is unbuildable, speculative land, there are no additional damages for the area outside the temporary easement.

Summing the figures calculated from the preceding analysis, the total compensation for the two-year temporary easements on WBC Property comes to $51,860.

### E. *Calculation of Interest*

On July 9, 1999, this Court granted Portland condemnation rights to permanent and temporary easements across WBC's property. Based on the preceding analysis, the total fair market value of the property interests taken (temporary easements, permanent easements, and diminution of value of the remainder) is found to be $152,677.00. WBC is entitled to interest on the damage award accruing from the date of the taking, July 1999, until the date of judgment. *See R.H. White Realty Co., Inc. v. Boston Redevelopment Auth.,* 371 Mass. 452, 452–53, 358 N.E.2d 440, 441 (1976). Although neither side has briefed the issue, caselaw suggests that a rate of 7 percent is reasonable until the date of

judgment because that was the prevailing money market rate in July 1999. *See Vector Pipeline, L.P. v. 68.55 Acres of Land,* 157 F.Supp.2d 949, 960 (N.D.Ill.2001). WBC is also entitled to interest (if any) from the date of entry of the judgment, up to and including the last day of the month prior to the month when the final judgment is satisfied, at federal interest rates.

### ORDER

This Court **ORDERS** that the plaintiffs shall pay the defendants $152,677.00 plus interest from the date of the taking.

**SO ORDERED.**